UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WARWICK G. CAHILL,

      Plaintiff,

v.                                    Case No. 8:05-cv-2031-T-24 TBM

COLIN CLEMENT, TAMPA PILOTS LLC,
and M/V DESOTO,

      Defendants.
_____/

## ORDER

This matter came before the Court on a non-jury trial that was held on May 22-23, 2007. After considering all of the evidence, including the testimony of the witnesses and the documentary exhibits admitted at the trial, the pleadings filed by the parties, the arguments made by counsel, and the legal authorities submitted to the Court, the Court makes the following findings of fact and conclusions of law.

**I.    Findings of Fact**

Plaintiff Warwick G. Cahill brought this suit in admiralty for damages arising out of an accident that occurred on the navigable waters of the State of Florida on December 28, 2003. Plaintiff, who is a Tampa Bay Pilot, was injured while disembarking from the tug TERESA onto the pilot boat DESOTO. Plaintiff sued Tampa Pilots, LLC, a Florida corporation of which Plaintiff is a member, the pilot boat DESOTO, as well as Colin Clement, who is an employee of

Tampa Pilots, LLC and the operator of the pilot boat at the time of the accident.[1] Plaintiff became a deputy Tampa Bay pilot in 1980 and has been a full-time Tampa Bay pilot since 1984.

On December 28, 2003, Plaintiff was piloting the Tug TERESA and its barge, the ACADIA, on an outbound trip from Tampa Bay to beyond the Sunshine Skyway Bridge. The TERESA, which is 127 feet long, and the ACADIA, which is 495 feet long, are an integrated tug-barge unit. At the time of the accident, the TERESA was in the notch of the ACADIA, secured to it by an Inter-Con system, and was pushing it as one single unit.

As the TERESA/ACADIA unit was passing underneath the Sunshine Skyway Bridge, sometime between 10:00 a.m. and 10:45 a.m., Plaintiff called the Tampa Bay pilot station to arrange to be picked up from the port quarter of the TERESA/ACADIA and brought to shore. Defendant Clement was the boatman on duty, and he left the pilot station with the pilot boat DESOTO to pick up Plaintiff from the TERESA. The pilot boat DESOTO is 60 feet long and is owned by Defendant Tampa Pilots, LLC. Defendant Clement had been operating the DESOTO and similar pilot boats for approximately 250 to 300 days before the date of the accident. He estimated that he had previously completed approximately 800 to 1,000 boardings.

After arranging the pickup, Plaintiff turned the controls over to Captain John Malzard, who was the licensed Master of the TERESA, and he advised Captain Malzard that he would be disembarking. Captain Malzard disengaged the port engine of the TERESA in order to reduce turbulence along the port side of the TERESA. Captain Malzard also called down to the galley to order an available crew member to assist Plaintiff in departing the vessel. Chief Engineer

---

[1] Plaintiff settled his claims against Penn ATB, Inc., the owner of the Tug TERESA, before trial, and therefore, those claims were not before the Court at trial.

Brian Bascom accompanied Plaintiff to the stern deck of the TERESA to assist with the disembarkation.

Near the port quarter bits on the stern deck of the TERESA, there is a designated location for pilots to disembark. The bulwark of the TERESA is painted yellow, indicating the location where the pilot should disembark. In addition, there is a step for the pilot to use to climb up onto the bulwark. There is also a removable steel rod, known as a stanchion, extending up from the bulwark that acts as a handhold for the disembarking pilots.

In order for a pilot to disembark from a tug onto a pilot boat, the pilot boat should approach the tug from the stern. According to the Tampa Pilots Association Boatman's Manual, once the pilot boat is very near the tug, the pilot boat should come alongside the tug "as parallel as possible using small course changes" and using "as little wheel as possible." This approach is intended to minimize the force of the collision, as "the forces around the stern of the tug may suck the pilot boat in and cause a hard hit." Although pilot boat operators use this same basic technique when coming alongside a tug barge unit, such as the TERESA/ACADIA, there are hidden currents, eddies, suctions, and other hydrodynamic effects that make each maneuver unique. These hydrodynamic effects are caused by currents and water conditions, and other times by the shape and design of the tug boat and barge.

Plaintiff and Chief Engineer Bascom waited on the stern deck of the TERESA for the pilot boat DESOTO to come alongside the port side of the TERESA so Plaintiff could disembark. The TERESA was heading west at approximately 10 knots. The weather was clear, the seas were smooth, and the winds were calm.

The DESOTO approached the TERESA from the stern and was positioned at a 45 degree

angle when it was approximately 20 feet away.  As the DESOTO approached, Plaintiff stepped up onto the bulwark at the disembarking point and held onto the steel rod with his right hand. Plaintiff stood in that position for approximately 30 seconds to 1 minute.  Plaintiff then observed that the DESOTO was approaching too fast, so he attempted to move out of the way of the DESOTO.  As Plaintiff was attempting to move behind the port quarter bits in order to protect himself, the DESOTO collided with the TERESA.  The DESOTO's starboard bow rode up onto the bulwark of the TERESA, striking the steel rod that Plaintiff was using as a handhold.  The steel rod in turn struck Plaintiff in the face, knocking him off of the bulwark and onto the deck and causing him injury.

Defendant Clement did not see Plaintiff standing on the bulwark before the collision.  As soon as he realized that Plaintiff was injured, Defendant Clement radioed the Coast Guard to inform them of the casualty and to request an ambulance.  Captain Malzard then slowed the TERESA/ACADIA unit and steered it to an anchorage in Tampa Bay.  Plaintiff was provided first aid and then transported to an emergency room in St. Petersburg, Florida.

As a result of the accident, Plaintiff suffered a fracture of the left inferior orbital rim, a contusion to the face, neck sprain, low back sprain and contusion, and broken and fractured teeth.  While he was at the hospital, Plaintiff had a 1.5 cm laceration near his left eye stitched. Plaintiff was later treated by Dr. Sam Diasti, M.D., who removed his sutures and treated him for low back pain.  Plaintiff was also treated by Dr. Dawn Bhasin, M.D., a surgeon with the Guggino Eye Center.  Dr. Bhasin surgically repaired Plaintiff's lower left eyelid, which had receded as a result of the facial trauma Plaintiff sustained in the accident.

Shortly after the accident, Plaintiff was also treated by a dentist, Dr. Jeffrey Lash,

D.M.D., who repaired a bridge that was knocked out of Plaintiff's mouth as a result of the trauma to his face in the accident. Dr. Lash continued to treat Plaintiff for significant periodontal problems that were caused by the accident, including repairing teeth that had been sheared off. Dr. Lash estimated that Plaintiff would need future dental treatment totaling $12,500.

In total, Plaintiff incurred the following medical bills, which were not covered by his group health insurance, as a result of the injuries he sustained on December 28, 2003:

| | |
|---|---|
| Bayfront Medical Center | $1,192.99 |
| SDI Diagnostics | $37.00 |
| Emergency Medical Physicians | $175.40 |
| Ruffolo, Hooper and Assocs. | $219.20 |
| SunStar EMS | $579.60 |
| Dental Health Group | $8,997.00[2] |
| Prescriptions | $21.00 |
| Total: | $11,222.19 |

Plaintiff was unable to work as a Tampa Bay pilot from the date of the accident until March 10, 2004. His lost earnings over that time period totaled $55,412.16. Plaintiff received disability payments from Tampa Pilots, LLC in the amount of $12,677.33.

**II.    Conclusions of Law**

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1333. In this case, Plaintiff claims that Defendants were negligent in the operation of the DESOTO on December

---

[2] It appears that Plaintiff miscalculated the total of his Dental Health Group bills as $8,992.00, in his Proposed Findings of Fact and Conclusions of Law. Upon the Court's independent review of these bills, specifically Plaintiff's Exhibit 1G, the Court concludes that this total should instead be $8,997.00, which represents a difference of $5.00.

5

28, 2003, and that such negligence was a legal cause of Plaintiff's injuries.  Specifically, Plaintiff alleges that Defendant Clement failed to keep the DESOTO under control, causing the DESOTO to violently collide with the TERESA, ride up onto the bulwark of the TERESA, and strike the steel rod, which in turn struck Plaintiff and caused him injuries.  Furthermore, Plaintiff alleges that Defendant Tampa Pilots, LLC is vicariously liable for the negligence of its employee and boatman, Defendant Clement.

To prevail on this claim, Plaintiff must prove by a preponderance of the evidence that Defendants were negligent, and that such negligence was a legal cause of damage sustained by Plaintiff.  Negligence is the failure to use reasonable care.  Reasonable care is that degree of care that a reasonably careful person would use under like circumstances.  Negligence may consist either in doing something that a reasonably careful person would not do under like circumstances, or in failing to do something that a reasonably careful person would do under like circumstances.[3]

Negligence is a legal cause of damage if it directly and in natural and continuance sequence produces, or contributes substantially to producing such damage, so it can reasonably be said that, except for the negligence, the loss, injury, or damage would not have occurred.  Negligence may be a legal cause of damage even though it operates in combination with the act of another, some natural cause, or some other cause if such other cause occurs at the same time as the negligence and if the negligence contributes substantially to producing such damage.

Here, Defendants contend that Plaintiff was also negligent and that such negligence was a legal cause of Plaintiff's own injury.  In order to prevail on this defensive claim, Defendants

---

[3]Pattern Jury Instruction 1.1, Eleventh Circuit Pattern Jury Instructions (Civil), 2005 ed.

must establish by a preponderance of the evidence that Plaintiff was also negligent, and that such negligence was a legal cause of Plaintiff's own damage.  A finding in favor of Defendants on this defense does not prevent recovery by Plaintiff, but rather reduces the amount of Plaintiff's recovery by the percentage of Plaintiff's comparative negligence.

After considering all of the evidence, including the testimony of the witnesses and the documentary exhibits admitted at the trial, the Court concludes that Plaintiff has demonstrated by a preponderance of the evidence that Defendant Clement was negligent in the operation of the DESOTO on December 28, 2003, and that such negligence was a legal cause of Plaintiff's injuries.  By his own admission, Defendant Clement established the fact that he did not bring the DESOTO as parallel as possible to the TERESA as it approached from the stern–a method of approach that is specifically intended to minimize the force of the collision.  Rather, Defendant Clement admitted at trial that the DESOTO was at a 45 degree angle to the TERESA when it was approximately 20 feet away.  Defendant Clement was an experienced boatman, who had completed approximately 800 to 1,000 boardings.  He knew of the risks associated with bringing a pilot boat alongside a tug boat, and he should have acted to reduce those risks by bringing the pilot boat as parallel as possible.  Accordingly, the evidence establishes that Defendant Clement failed to use reasonable care when operating the DESOTO, which caused the DESOTO to strike the TERESA with a harder-than-normal impact, ride up onto the bulwark of the TERESA, and knock the steel rod into Plaintiff, and that Defendant Tampa Pilots, LLC is vicariously liable for his negligence.

The Court also concludes, however, that Defendants have established by a preponderance of the evidence that Plaintiff was also negligent on the date in question, and that his negligence

contributed to the injuries he sustained. Having worked as a pilot for more than 20 years, Plaintiff had embarked and disembarked from numerous vessels countless times. As an experienced pilot, Plaintiff knew that the maneuver that brings the pilot boat alongside the tug boat is fraught with hidden dangers, including hydrodynamic effects and suction, which can cause the pilot boat to come in faster or slower than anticipated by the pilot boat operator. Plaintiff's decision to stand on the bulwark of the TERESA for approximately 30 seconds to 1 minute while waiting for the DESOTO to approach, rather than waiting on the deck, was unreasonable given the risks associated with this maneuver. Accordingly, the evidence establishes that Plaintiff also failed to use reasonable care and that his own comparative negligence was 50% responsible for his damages. Plaintiff's comparative negligence, however, does not prevent Plaintiff's recovery, but rather reduces the amount of his recovery by 50%.

Based on these findings, the Court concludes that Plaintiff sustained the following damages as a result of Defendants' negligence:

| | |
|---|---|
| Past medical and dental expenses not covered by health insurance: | $11,222.19 |
| Future dental expenses: | $12,500.00 |
| Lost earnings minus disability payment setoff: $55,412.16 - $12,677.33 = | $42,734.83 |
| Pain and suffering: | $25,000.00 |
| Subtotal: | $91,457.02 |
| Less Plaintiff's comparative negligence (50%): | <$45,728.51> |
| Total: | $45,728.51 |

Accordingly, Plaintiff is awarded $45,728.51 as the amount of money that fairly and adequately

compensates him for the damages he sustained on December 28, 2003, after considering his comparative fault. In reaching this conclusion, the Court concludes that $25,000 adequately compensates his for his pain and suffering, based on Plaintiff's testimony at trial regarding his injuries and rehabilitation.

The Court also concludes that the $12,677.33 that Plaintiff received in disability payments should be offset from his lost earnings. Under the collateral source rule, "the employer-tortfeasor is not entitled to mitigate damages by setting off compensation received by the employee from an independent source." *Houghton v. Blackships, Inc.*, 462 F.2d 788, 790 (5th Cir. 1972). However, the "[a]pplication of the . . . rule depends less upon the source of funds than upon the character of the benefits received." *Id.* "[T]he source of the funds may be determined to be collateral or independent, even though the employer-tortfeasor supplies such funds." *Id.*

To determine the applicability of the rule, the Court must determine whether the benefit paid for by the employer-tortfeasor–here, the disability pay–was intended to indemnify the employer against future legal liability, or instead was intended as a fringe benefit, or deferred compensation, for the employee. *Id.* (finding that the employer's payments into a maritime retirement pension fund were not made for the purpose of responding to legal liability and therefore could not be set off from the plaintiff's damages); *see also, Phillips v. Western Co. of N. Amer.*, 953 F.2d 923, 932 (5th Cir. 1992). The following five factors are used to distinguish between fringe benefits and benefits intended to respond to legal liability:

> "(1) whether the employee makes any contribution to funding of the disability payment; (2) whether the benefit plan arises as the result of a collective bargaining agreement; (3) whether the plan and payments thereunder cover both work-related and non work-related injuries; (4) whether payments from the plan

9

>are contingent upon length of service of the employee; and (5) whether the plan contains any specific language contemplating a set-off of benefits received under the plan against a judgment received in a tort action."

*Id.* (quoting *Allen v. Exxon Shipping Co.*, 639 F. Supp. 1545, 1548 (D. Me. 1986)).

Here, the parties presented almost no evidence to assist the Court in making this determination, and therefore, the Court is forced to rely almost exclusively on the post-trial briefs submitted by the parties on this issue. (Doc. Nos. 53, 54.) Neither party admitted the disability plan into evidence. Furthermore, the testimony of Kathy Dalpiaz, the operations manager who the defense called to testify regarding the disability pay, was unpersuasive and inconclusive.[4]

The Court concludes that the first factor weighs in favor of a setoff because Plaintiff did not contribute to the funding of the disability plan.[5] Although there was no evidence regarding whether the disability plan was a result of a collective bargaining agreement, both parties agree in their post-trial briefs that it was not, and therefore, this factor also weighs in favor of a setoff. Nor was there any evidence regarding whether the plan covers both work-related and non-work related injuries. However, the parties agree that it covers both, and therefore, this factor weighs against a setoff. There was no evidence regarding whether the plan is contingent upon the

---

[4]Ms. Dalpiaz testified on cross-examination that she did not consider the disability plan a "fringe benefit," but later testified that it was a "benefit" for the pilots. She also testified that the plan had nothing to do with legal liability. The Court rejects this testimony because Plaintiff failed to establish either on cross-examination or in its post-trial brief that Ms. Dalpiaz had specific knowledge regarding the purpose and creation of the disability plan.

[5]The Court rejects Plaintiff's argument that the revenues he generated were used to fund the disability plan. It is obvious that a corporate entity receives revenues through the work of individuals, which it uses to fund operations. Plaintiff presented no evidence that he directly contributed to the disability plan.

employee's length of service, but both parties agree that it is not contingent, and therefore, this factor weighs in favor of setoff. Finally, although the parties did not admit the disability plan, they agree that it does not contain specific language regarding a setoff, and therefore, this factor weighs against a setoff. Accordingly, because the balance of factors weighs in favor of setoff, the Court concludes that the dominant purpose of the disability plan was to provide for the employer's indemnification against liability. Therefore, the amount Plaintiff received in disability payments should be offset from his lost earnings.

### III. Conclusion

Accordingly, it is **ORDERED AND ADJUDGED** that the Clerk is directed to enter judgment in favor of Plaintiff and against Defendants in the amount of $45,728.51 and to close this case.

**DONE AND ORDERED** at Tampa, Florida, this 9th day of August, 2007.

Copies to:
Counsel of Record

SUSAN C. BUCKLEW
United States District Judge